**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-1643**

———————

ROBERT WHITMIRE,

Plaintiff - Appellant,

v.

SOUTHERN FARM BUREAU LIFE INSURANCE COMPANY,

Defendant - Appellee.

———————

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  Richard E. Myers, II, Chief District Judge.  (5:20-cv-00018-M)

———————

Argued:  January 26, 2022                          Decided:  October 26, 2022

———————

Before WILKINSON, WYNN, and RICHARDSON, Circuit Judges.

———————

Affirmed by published opinion.  Judge Wynn wrote the opinion, in which Judge Wilkinson joined. Judge Wilkinson wrote a separate concurring opinion, and Judge Richardson wrote a dissenting opinion.

———————

**ARGUED:**    Joseph Mattia, THE BOONSWANG LAW FIRM, Philadelphia, Pennsylvania, for Appellant.  Aaron Edward Pohlmann, WOMBLE BOND DICKINSON (US) LLP, Atlanta, Georgia, for Appellee.  **ON BRIEF:**  K. Alan Parry, PARRY LAW, PLLC, Chapel Hill, North Carolina, for Appellant.  Gemma L. Saluta, WOMBLE BOND DICKINSON (US) LLP, Winston-Salem, North Carolina, for Appellee.

WYNN, Circuit Judge:

In this case, we are tasked with interpreting a North Carolina statute regulating life insurance companies. The provision states that "[n]o life insurance corporation doing business in this State" (and meeting certain other requirements which are not relevant here) may cancel a life insurance policy within one year of default unless it satisfies certain notice requirements. N.C. Gen. Stat. § 58-58-120. One of the requirements, as relevant here, is that the notice be "duly addressed and mailed, postage paid, to the person whose life is insured . . . at his or her last known post-office address *in this State*." *Id.* (emphasis added). The question before us is whether we must blind ourselves to the legislative purpose for that statute and instead woodenly construe the statute's language to require an insurer to send a cancellation-of-insurance letter to an address where it is undisputed the insured no longer lived. Surely not.

North Carolina applies the traditional purposivist approach to statutory interpretation. That approach interprets the text of the statute to align with its purpose. A faithful application of that approach shows that the defendant satisfied any notice requirement created by N.C. Gen. Stat. § 58-58-120. The mechanical, inflexible reading of the text urged by the plaintiff in this case is inconsistent with the statute's purpose, and for that reason is rejected.

I.

On May 23, 2005, Southern Farm Bureau Life Insurance Company ("Farm Bureau") issued a term life insurance policy to Susan Whitmire. Ms. Whitmire's husband was the policy's primary beneficiary. The policy, payable either annually or semiannually, had a

2

grace period of thirty-one days and specified that the policy would lapse if "any premium due remains unpaid at the end of the grace period." J.A. 42.[1] For most of the policy's duration, the bills were paid on time—Farm Bureau would send a semiannual bill to Ms. Whitmire's address in Goldsboro, North Carolina, and would then receive payment by check. The payments were normally made by Mr. Whitmire. This continued until May 2016, when Ms. Whitmire filed a change-of-address form with the Post Office. The form indicated that Ms. Whitmire had moved to a new address in Rock Hill, South Carolina.[2]

Farm Bureau received a notification from the Post Office indicating that Ms. Whitmire's address had changed. So, seeking to keep accurate records, Farm Bureau sent two notices to Ms. Whitmire in June 2016—one to her former address in Goldsboro, North Carolina, and another to her new address in Rock Hill, South Carolina.

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

[2] Although there is conflicting evidence as to whether Ms. Whitmire moved back to North Carolina several months later, the following facts are undisputed. Mr. and Ms. Whitmire separated in March 2016, at which time Ms. Whitmire left Goldsboro, North Carolina and moved to Rock Hill, South Carolina. Ms. Whitmire exchanged her North Carolina driver's license for a South Carolina driver's license in June 2016, her bank statements from April 2016 through March 2017 list her Rock Hill, South Carolina address, and her car insurance documents covering a similar period list the same address. The record contains no indication that Ms. Whitmire ever filed a change-of-address form with the United States Postal Service reflecting that she had moved back to North Carolina. Ms. Whitmire had not returned to live permanently in North Carolina by the end of November 2016. And Ms. Whitmire was in South Carolina when she passed away in March 2017. Mr. Whitmire claims that Ms. Whitmire moved back to North Carolina at some point after Christmas in December 2016. We may assume this is true, although it is immaterial. *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 324 (4th Cir. 2017) (noting that we construe facts in favor of the nonmoving party when reviewing a lower court's summary judgment award).

The letter sent to Ms. Whitmire's former address in North Carolina stated that Farm Bureau's "records indicate[d] that [her] address ha[d] been recently changed" and asked Ms. Whitmire to contact Farm Bureau if that was incorrect. J.A. 97. The letter sent to Ms. Whitmire's new address in South Carolina indicated that Farm Bureau had been notified of Ms. Whitmire's address change. It gave Ms. Whitmire the contact information for a local Farm Bureau agency located in York, South Carolina. Farm Bureau did not receive a response to either letter.[3]

In November 2016, Farm Bureau sent its semiannual bill to Ms. Whitmire at her South Carolina address, informing her that her payment was due on November 23, 2016. Ms. Whitmire did not pay the bill. Farm Bureau sent Ms. Whitmire a "Notice of Lapse" the following month, on December 28, 2016. This notice indicated that the grace period for Ms. Whitmire's policy had run, and that the policy had lapsed. The notice also offered to keep Ms. Whitmire's policy in effect if she paid the premium due by January 22, 2017. Farm Bureau did not receive a premium payment. On January 27, 2017, Farm Bureau sent another letter to Ms. Whitmire in South Carolina. This letter again indicated that the policy had lapsed but invited Ms. Whitmire to submit a reinstatement application.

On March 10, 2017, Ms. Whitmire died. Six days later, her husband, Mr. Whitmire, contacted Farm Bureau's agent to file a claim on Ms. Whitmire's life insurance policy.

---

[3] Mr. Whitmire, the plaintiff in this case, testified in a deposition that he has lived at the Goldsboro, North Carolina address since 2005, and seemingly lived at that address in June 2016 when the change-of-address notice for Ms. Whitmire's life insurance policy was sent to that address.

4

However, Mr. Whitmire was told that the policy had lapsed due to nonpayment. Farm Bureau then sent a letter to Mr. Whitmire on April 27, 2017, informing him that his claim for benefits was denied.

Mr. Whitmire sued Farm Bureau in federal district court, seeking the policy's coverage amount as well as excess damages for alleged unfair and deceptive trade practices on the part of Farm Bureau. He argued that Farm Bureau had not complied with a statutory notice requirement prior to canceling the insurance policy for nonpayment and he was therefore entitled to the policy's benefits. *See* N.C. Gen. Stat. § 58-58-120. Specifically, he contended that Farm Bureau, which sent its notice to Ms. Whitmire in South Carolina after she moved there and after being notified of her change of address, should have instead sent its notice to her former address in North Carolina. The parties filed cross-motions for summary judgment, and the district court granted summary judgment to Farm Bureau. Because we agree with the district court's conclusion that Farm Bureau complied with the statute's notice requirement, we affirm.

## II.

### A.

"We review the district court's grant of summary judgment *de novo*, using the same standard applied by the district court." *Goodman v. Diggs*, 986 F.3d 493, 497 (4th Cir. 2021) (internal quotation marks and citation omitted). In doing so, we "view the facts in the light most favorable to the nonmoving party." *Kitchen v. Upshaw*, 286 F.3d 179, 182 (4th Cir. 2002). Summary judgment is appropriate whenever "there is no genuine dispute

5

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In this diversity case, we must "apply the governing state law" and determine how the Supreme Court of North Carolina would rule were it to decide this case. *Stahle v. CTS Corp.*, 817 F.3d 96, 99–100 (4th Cir. 2016). Because we are called to interpret a North Carolina statute, we must use the interpretive methodology of the Supreme Court of North Carolina. *Wells v. Liddy*, 186 F.3d 505, 528 (4th Cir. 1999); *see also Etherton v. Owners Ins.*, 829 F.3d 1209, 1224 (10th Cir. 2016) ("When interpreting a state statute in a diversity case, this court must apply state rules of statutory construction." (citation omitted)).

North Carolina courts for decades have applied the interpretive approach of purposivism by looking for the statute's purpose in its text and title and in the effects of alternate interpretations. *See State v. Gaines*, 421 S.E.2d 569, 572 (N.C. 1992) ("We have held it to be a cardinal principle that in the construction of statutes courts should always seek to give effect to the legislative intent, which may be discerned by consideration of the *purpose* of the statute, the evils it was designed to remedy, the effect of proposed interpretations of the statute, and the traditionally accepted rules of statutory construction." (internal quotation marks and citation omitted)); *see also State v. Alexander*, 869 S.E.2d 215, 229 (N.C. 2022) (explaining that the Supreme Court of North Carolina will consider an act's title to determine purpose "even when the language of a statute is plain" (citation omitted)).

Under North Carolina law, "[t]he goal of statutory interpretation is to determine the meaning that the legislature intended upon the statute's enactment." *State v. Rankin*, 821

6

S.E.2d 787, 792 (N.C. 2018). North Carolina courts, wisely, do not limit themselves to the text of a statute: "The intent of the General Assembly may be found first from the plain language of the statute, then from the legislative history, the spirit of the act[,] and what the act seeks to accomplish." *Id.* (quoting *State v. Langley*, 817 S.E.2d 191, 196 (N.C. 2018)); *see also Coastal Ready-Mix Concrete Co. v. Bd. of Comm'rs*, 265 S.E.2d 379, 385 (N.C. 1980) ("The best indicia of [legislative] intent are the language of the statute or ordinance, the spirit of the act[,] and what the act seeks to accomplish.").

To be sure, when a statute's language is "clear and without ambiguity, it is the duty of [an interpreting court] to give effect to the plain meaning of the statute, and judicial construction of legislative intent is not required." *Winkler v. N.C. State Bd. of Plumbing*, 843 S.E.2d 207, 210 (N.C. 2020) (quoting *N.C. Dep't of Corr. v. N.C. Med. Bd.*, 675 S.E.2d 641, 649 (N.C. 2009)). But when applying a literal reading to the text of a statute "contravene[s] the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control." *Rankin*, 821 S.E.2d at 792 (quoting *State v. Beck,* 614 S.E.2d 274, 277 (N.C. 2005)).

## B.

Here, a literal interpretation of the statute would "contravene the manifest purpose of the Legislature." *Id.*

Section 58-58-120 of the North Carolina General Statutes provides that "[n]o life insurance corporation doing business in this State shall, within one year after the default in payment of any premium . . . declare forfeited or lapsed any policy . . . unless a written or printed notice stating the amount of such premium, . . . the place where it shall be paid, and

7

the person to whom the same is payable has been duly addressed and mailed, postage paid, to the person whose life is insured . . . at his or her last known post-office address in this State." The notice must be mailed "at least five and not more than 45 days prior to the day when the same is payable as regards policies which do contain a provision for grace or are entitled to grace in the payment of premiums." N.C. Gen. Stat. § 58-58-120. It "shall also state that unless such premium . . . shall be paid . . . by or before the day it falls due, the policy and all payments thereon will become forfeited and void," and in any case the policy must remain in effect "until the expiration of 30 days after the mailing of such notice." *Id.*

The statute is titled "[n]otice of nonpayment of premium required before forfeiture." *Id.* The statute's enabling act was titled "An Act to Prevent the Forfeiture of a Life Policy Without Notice." Ch. 884, § 1, 1909 N.C. Sess. Laws 1293, 1293. The statute requires that a life insurer wait one year before canceling a life insurance policy for nonpayment unless the insurer sends the required notice. N.C. Gen. Stat. § 58-58-120. The statute's purpose then, as evidenced by the titles of the section and the enabling act as well as the statute's effect, is to ensure that life insurance companies doing business in North Carolina provide their insureds with notice before canceling their policies for nonpayment. *See Alexander*, 869 S.E.2d at 229 ("[E]ven when the language of a statute is plain, the title of an act should be considered in ascertaining the intent of the legislature." (internal quotation marks and citations omitted)); *Gaines*, 421 S.E.2d at 572.

Farm Bureau did exactly that. As noted earlier, Farm Bureau sent Ms. Whitmire her November 2016 semiannual policy bill. The letter informed Ms. Whitmire that she had a premium payment due on November 23, 2016, in the amount of $1,062.20. It informed Ms.

8

Whitmire how she could pay the premium and where to send the payment for it to reach Farm Bureau. Moreover, it was mailed on November 7, 2016, sixteen days before the premium's due date. Finally, it was not until December 28, 2016, fifty-one days after the mailing of the relevant notice, that Farm Bureau sent a letter to Ms. Whitmire informing her that her policy had lapsed due to nonpayment—meaning that the policy remained in effect for more than thirty days after the notice's mailing.

Nevertheless, Mr. Whitmire argues that Farm Bureau failed to comply with the statute's requirement that the notice be mailed "to the person whose life is insured . . . at his or her last known post-office address *in this State*." N.C. Gen. Stat. § 58-58-120 (emphasis added). Focusing myopically on those final three words, he claims that Farm Bureau was required to provide notice to Ms. Whitmire at her last known address *in this state* even though it is undisputed that Ms. Whitmire was living *out of state*, and even though Farm Bureau had been notified of Ms. Whitmire's change of address. In other words, Mr. Whitmire asserts that if an insured purchases a policy in North Carolina listing her address in this state, then moves to another state and informs the insurer via a change-of-address form from the United States Postal Service of her new address in another state, the insurer still must send any future cancellation notices to the last known address *in this state*—even though it is undisputed that she is no longer living in this state. That's poppycock.

There is no doubt, of course, that the words "this State" in the statute refer to the State of North Carolina. However, applying an inflexibly literal reading of the statute—deciding that only a notice mailed to a North Carolina address can comply with the

9

statute—would contravene the North Carolina General Assembly's purpose, which must ultimately control our interpretation. *See State v. Curtis*, 817 S.E.2d 187, 189 (N.C. 2018) ("Moreover, when a literal interpretation of the language of a statute will . . . contravene the manifest purpose of the Legislature, as otherwise expressed, the reason and purpose of the law shall control and the strict letter thereof shall be disregarded." (internal quotation marks and citation omitted)).

Here, Farm Bureau sought to cancel Ms. Whitmire's policy due to nonpayment. It knew at the time it issued the relevant notice that Ms. Whitmire did not live in North Carolina. And the statute unquestionably required Farm Bureau to send a notice to Ms. Whitmire before considering her policy lapsed. N.C. Gen. Stat. § 58-58-120. However, applying a literal interpretation of the statute's language—referring to a notice being sent to the "last known post-office address in this State"—would not put Ms. Whitmire on notice at all. Rather it would have Farm Bureau send "notice" to an address where it knows she no longer resides. *But see id.* (requiring the notice be mailed "to the person whose life is insured").

The absurdity manifested by the effects of this literal interpretation underscores its incongruence with the statute's purpose. If, as Mr. Whitmire proposes, the plain meaning of "last known post-office address in this State" must be read inflexibly—such that the notice is required to be sent to the last *North Carolina* address that an insurance company has on file, even when an insured has moved out of state—that reading cannot be cabined to just the facts of this case. It must be applied to every policy issued in North Carolina. This would mean that if an insurer wishes to cancel a policy, it must send the notice to the

10

last known address "*in this State*" no matter how long ago the insured may have moved out of state. It would apply even if the last known address "in this State" no longer exists—for example, if the house had burned down. None of this can be squared with the General Assembly's clearly communicated purpose: "to Prevent the Forfeiture of a Life Policy Without Notice." 1909 N.C. Sess. Laws 1293.

Additionally, there is substance in Farm Bureau's argument that a rigidly literal reading of the words "in this State" would require insurers to implement burdensome and nonsensical notice policies. Farm Bureau asserts that, under such a reading, for every payment period a life insurer would be required to send *two* notices to any insured who moves out of state: one to the insured's actual out-of-state address, and the other to the insured's former address in North Carolina. The dissent contends that the North Carolina legislature may have determined that the "added expense to insurers" resulting from this system "is worth the increased likelihood of notice to in-state insureds." Dissenting Op. at 22. But this explanation ignores the fact that, under the dissent's reading, the statute does not require the insurer to send notice to the actual out-of-state address at all. Insurers might choose to avoid this cost by sending a single notice only to the insured's former address in North Carolina—satisfying the statutory requirement under the dissent's reading while effectively providing no notice at all to out-of-state insureds. This contravenes the act's purpose as evidenced by the broad reference in its title to preventing the forfeiture of a life insurance policy without notice.

Requiring an insurer to send notice to a defunct address does not serve the statute's purpose, and we do not think that the Supreme Court of North Carolina would adopt an

11

interpretation that would require an insurer to do so. Section 58-58-120 established no barrier to Farm Bureau canceling the policy for nonpayment after sending its notice to Ms. Whitmire's actual address. As a result, Farm Bureau did not breach its contract by denying Mr. Whitmire's claim for benefits.[4]

### III.

North Carolina law recognizes that in cases where judges are called to interpret the meaning of a statute, we must bear in mind that we are not its authors. In other words, when we are deciding what a statute does—what its effect on the real world will be—we should be guided, as best we can, by what the drafters were *trying to do* and view it as some evidence of what the statute *actually does*. The state's long-standing purposive approach recognizes that if we are not guided by the purpose of the legislature, then we risk substituting our own purposes. It keeps us faithful to our solemn charge "to interpret law created by others and 'not to prescribe what it shall be.'" *Danforth v. Minnesota*, 552 U.S. 264, 290 (2008) (quoting *Am. Trucking Assns. v. Smith*, 496 U.S. 167, 201 (1990) (Scalia, J., concurring)).

---

[4] Because § 58-58-120 did not prevent Farm Bureau from terminating the policy, we also affirm the district court's dismissal of Mr. Whitmire's claim for unfair or deceptive trade practices. Under North Carolina law, when a claim of unfair and deceptive trade practices is premised on a breach of contract, a successful defense to the breach claim will defeat the claim of an unfair and deceptive trade practice. *See, e.g.*, *SciGrip, Inc. v. Osae*, 838 S.E.2d 334, 347–48 (N.C. 2020) (discussing the interaction between the claims and citing *Griffith v. Glen Wood Co.*, 646 S.E.2d 550, 558 (N.C. Ct. App. 2007) for the proposition that a plaintiff must show both a breach of contract and substantial aggravating circumstances to support a claim of unfair and deceptive trade practices).

The judgment of the district court is

*AFFIRMED.*

WILKINSON, Circuit Judge, concurring:

I concur in Judge Wynn's fine opinion. It faithfully reflects North Carolina law as I understand it, and it draws from my good colleague's own distinguished service on the North Carolina courts.

I concur with the understanding that statutory interpretation begins with an analysis of the enactment's text and context. Where the disposition of a case can be reasonably but not definitively grounded in the text of the statute itself, it is fair to turn to the question of the statute's purpose. But the purpose cannot contradict the text. The text after all is the specific means the legislature chose to implement the statute's general purpose, and the consideration of that purpose without those means of implementation would be a hollow exercise. Here, as Judge Wynn rightly explains, text and purpose can be seen to act in tandem, and that harmony leads to the best resolution of this case.

I believe that the result here is quite defensible on textual grounds. The "last known post-office address in this State [North Carolina]" of the person whose life is insured is no longer in the state. N.C. Gen. Stat. § 58-58-120. It is undisputed that Ms. Whitmire was living out of state in South Carolina. The statute can easily be read to require that when an insured no longer lives in North Carolina the insurance company is free to send correspondence to the insured's actual and most up to date out of state address. And when one combines that textual reading with the review of the insurer's conduct, the case for affirmance becomes all the stronger.

I write separately to note the efforts Southern Farm Bureau Life Insurance made to notify Ms. Whitmire that her premium payments were due. In view of these efforts, I do

14

not think the company can possibly be judged guilty of an unfair or deceptive trade practice and liable for the pertinent treble damages thereto. *See* N.C. Gen. Stat. § 75-1.1. North Carolina has reserved unfair and deceptive trade practices violations for truly bad actors. *See Dalton v. Camp*, 548 S.E.2d 704, 711 (N.C. 2001). And the record amply demonstrates Southern Farm Bureau is not one of those.

In this case, as the statute contemplates, Ms. Whitmire received notice of her policy status galore. Southern Farm Bureau learned that Ms. Whitmire had moved from North Carolina to South Carolina through an official Postal Service change-of-address order. To ensure it was directing communications to the correct address, Southern Farm Bureau did in fact send a letter to Ms. Whitmire's old North Carolina address informing her that it was aware of her move to South Carolina and requesting that she contact the company if she had not moved. Southern Farm Bureau *also* sent a letter to her new South Carolina address notifying her that it was aware of her relocation. Ms. Whitmire failed to respond to either letter. Southern Farm Bureau therefore sent all future notices to her new South Carolina address, the same address to which Ms. Whitmire's bank statements and car insurance correspondence were directed.

Two weeks before her biannual premium payment was due, Southern Farm Bureau sent Ms. Whitmire a premium notice. Ms. Whitmire failed to make payment on the policy. Southern Farm Bureau nevertheless sent her another letter offering to keep the policy in force if payment was made by a later date. And after this extended deadline also passed without any payment, Southern Farm Bureau sent a final letter stating that the policy had lapsed but inviting her to apply for reinstatement.

15

These are not the machinations of an insurer conniving to terminate coverage. As unpleasant as premiums are, they disperse risk and allow the insurance principle to work. And Southern Farm Bureau's conscientious efforts to notify Ms. Whitmire of her obligation to make payment should come as no surprise. Only by sending a premium notice to the insured's actual address can an insurance company maximize the odds that the person remembers to make the premium payments due. Southern Farm Bureau thus had every incentive to provide Ms. Whitmire with actual notice. But the appellant now says that Southern Farm should be forced to pay out on an insurance policy despite its diligent efforts to provide a premium notice to Ms. Whitmire at her most up-to-date address and despite her multiple failures to make premium payments.

Whether one views the statute through the lens of textualism, pragmatism, or purposivism, the result is the same. The appellant is seeking a double windfall here, first from an alleged breach of the statute's notice provision, and secondly from the treble damages UDTPA add-on. One windfall is one too many given the circumstances of this case. The district court dismissed the suit, and I agree with Judge Wynn that an affirmance of that dismissal is in order.

RICHARDSON, Circuit Judge, dissenting:

This case turns on the meaning of eight words in a century-old North Carolina insurance statute. North Carolina General Statute § 58-58-120 prohibits an insurer from immediately terminating a life insurance policy for premium nonpayment unless it first sends notice to the insured's "last known post-office address in this State." The question presented here is whether sending notice to the insured's address in a *different* state satisfies this requirement. The majority finds that North Carolina would not blindly apply the statute's "inflexible" language. The statute's language is indeed inflexible. But because that language inescapably requires notice be sent to a North Carolina address—the insured's last known post-office address "in this state"—I believe that North Carolina would not ignore this clear statutory instruction based on some imagined statutory purpose. So I respectfully dissent.

Southern Farm Bureau Life Insurance Company sold Susan Whitmire a $500,000 life insurance policy in 2005, with her husband Robert Whitmire as beneficiary. The policy listed the couple's marital home in Goldsboro, North Carolina. And Farm Bureau mailed semiannual premium statements to that address for eleven years. Each time, the premium was timely paid. After Mr. and Ms. Whitmire separated, Ms. Whitmire moved to Rock Hill, South Carolina. Farm Bureau learned of her changed address from the Postal Service, and it mailed the bill for the life insurance premium to the South Carolina address. The premium was not paid. Farm Bureau sent two notices to Ms. Whitmire's South Carolina address. And when the premium was still not paid, Farm Bureau terminated the policy. Ms. Whitmire died just a few months later.

17

Mr. Whitmire filed a claim on the life insurance policy, which Farm Bureau rejected due to the policy's lapse.  This suit followed.  After the district court found that sending notice to the insured's address in another state satisfied the requirement to send notice to the "last known post-office address in this State," it granted summary judgment to Farm Bureau.  Mr. Whitmire timely appealed.

When sitting in diversity, we follow state law as announced by the state's highest court. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).  If the Supreme Court of North Carolina has not spoken on an issue, we are tasked to predict how it would rule if asked. *Twin City Fire Ins. v. Ben Arnold-Sunbelt Beverage Co. of S.C.*, 433 F.3d 365, 369 (4th Cir. 2005).  This rule applies with equal force to questions of statutory interpretation. *See Fid. Union Tr. Co. v. Field*, 311 U.S. 169, 178–79 (1940).  We are not to decide how we would interpret the statute at hand based on our own interpretive principles, but must apply the interpretive methodology of the Supreme Court of North Carolina to predict the construction they would reach. *See Liberty Mut. Ins. v. Triangle Indus., Inc.*, 957 F.2d 1153, 1156 (4th Cir. 1992).

It is true that, in North Carolina, "[l]egislative intent controls the meaning of a statute."  *N.C. Farm Bureau Mut. Ins. Co. v. Dana*, 866 S.E.2d 710, 716 (N.C. 2021) (quoting *Brown v. Flowe*, 507 S.E.2d 894, 895 (N.C. 1998)).  But the statute's language is critical for understanding that intent.  "If the language of the statute is clear and is not ambiguous, we must conclude that the legislature intended the statute to be implemented according to the plain meaning of its terms."  *Lunsford v. Mills*, 766 S.E.2d 297, 301 (N.C. 2014) (quoting *Hyler v. GTE Prods. Co.*, 425 S.E.2d 698, 701 (N.C. 1993)).  In other

18

words, "courts should give effect to the words actually used in a statute." *Dana*, 866 S.E.2d at 716; *In re J.E.B.*, 853 S.E.2d 424, 428–29 (N.C. 2021) ("When the meaning is clear from the statute's plain language, we 'give effect to the plain meaning of the statute, and judicial construction of legislative intent is not required'" (quoting *Winkler v. N.C. State Bd. of Plumbing*, 843 S.E.2d 207, 210 (N.C. 2020)). When the statutory language is ambiguous, and some construction is required, then the language "should be construed so that the resulting construction 'harmonizes with the underlying reason and purpose of the statute.'" *Dana*, 866 S.E.2d at 716 (quoting *Elec. Supply Co. v. Swain Elec. Co.*, 403 S.E.2d 291, 294 (N.C. 1991)).

"The Court's analysis therefore properly begins with the words themselves." *Brown*, 507 S.E.2d at 896. Section 58-58-120 provides that notice must be mailed to the insured's "last known post-office address in this State." "[T]his State" can only refer to North Carolina. No one contests that point, nor could they. "This" means "present or near in place, time, or thought, or to something just mentioned or to be mentioned." *This*, Webster's Collegiate Dictionary (G. & C. Merriam Co. 3d ed. 1917). The capitalization of "State" refers to a particular state, rather than any state generally. And the North Carolina intermediate appellate court has interpreted "last known address" in another insurance-related context to mean "the most recent mailing address known to the insurer." *Allstate Ins. v. Nationwide Ins.*, 346 S.E.2d 310, 312 (N.C. Ct. App. 1986). Taken together, the statute's plain language requires that notice be mailed to the insured's last known address in North Carolina. So to comply with § 58-58-120, Farm Bureau had to send notice to the Goldsboro, North Carolina address. This it failed to do.

19

The majority doesn't dispute what the plain language of § 58-58-120 requires. Maj. Op. at 10. Rather, it claims that a literal reading "would 'contravene the manifest purpose of the Legislature.'" Maj. Op. at 7 (quoting *State v. Rankin*, 821 S.E.2d 787, 792 (N.C. 2018)). So it concludes that Farm Bureau satisfied § 58-58-120 by sending notice to Ms. Whitmire's South Carolina address. Maj. Op. at 12. But the majority's approach reads the phrase "in this State" out of the statute entirely—turning "last known post-office address in this State" into "last known post-office address." Simply deleting words from the statute in this way violates North Carolina's canon against surplusage. *See Lunsford*, 766 S.E.2d at 301 ("[I]t is our duty to give effect to the words actually used in a statute and not to delete words used . . . .").

The majority attempts to justify its atextual interpretation by first divining a purpose uncoupled from the statutory text and then concluding that a conflict between that purpose and the literal interpretation of the text permits rewriting the statute. It errs at each step.

The majority errs at the first step because the best evidence of a statute's purpose is its express language. For that reason, North Carolina requires that if "the language of the statute is clear and is not ambiguous, we must conclude that the legislature intended the statute to be implemented according to the plain meaning of its terms." *Lunsford*, 766 S.E.2d at 301. So absent some alternative reasonable construction of the statutory text, there is no reason to go hunting around for some alternative statutory purpose. And there is only one reasonable way to construe the words "in this State."

Even were we to go hunting for a purpose beyond the statute's literal meaning, the majority's identified purpose is not manifestly expressed by the Legislature. The enacting

20

legislation is entitled "An Act to Prevent the Forfeiture of a Life Policy Without Notice." 1909 N.C. Pub. Sess. Laws at 1293. The majority uses this to conclude that the legislature's purpose was to ensure that *all* insured persons receive pre-termination notice. Maj. Op. at 8. But the law's focus on actions "in this State" suggests that it might not aim to guarantee that all insured persons everywhere receive notice before their policy is terminated. It might instead ensure only that North Carolinians do. *Cf. Napier v. Bankers' Life Ins.*, 100 N.Y.S. 1072, 1076 (N.Y. Sup. Ct. 1906) (noting for a similar New York statute that "the Legislature of the state may be deemed to have intended to provide only for the protection of the rights of policyholders within this state, leaving to other states to impose such restrictions with regard to forfeiture" for their own residents). The Act does so by demanding that, for North Carolina insurance policies taken out by North Carolina residents, a pre-termination notice be sent to their last-known North Carolina address. If they no longer live in North Carolina, then the notice will not reach them; but they are also no longer in the class of persons the law seeks to protect. On the other hand, they may still reside in North Carolina, and the supposed change in address may have been erroneous, or only temporary. In that case, § 58-58-120 helps ensure they will receive notice. In other words, the legislature's primary purpose might well have been to protect its own citizens by ensuring that policyholders who now reside in North Carolina receive pre-termination

21

notice.  And, if so, then the plain language of § 58-58-120 would be a reasonable way to do so.[1]

The majority also errs at the second step.  Having divined a broad and inclusive purpose for the statute, the majority concludes that a literal interpretation of § 58-58-120 will produce unreasonable and absurd results.  Maj. Op. at 10.  Under the literal reading of § 58-58-120, the majority insists that insurers will be forced to wastefully send notices every payment period to defunct North Carolina addresses even when the insured moved out of state decades ago.  Maj. Op. at 11.  I reject that argument for three reasons.

First, the majority's concerns that a literal interpretation would lead to absurdity is nothing more than a disagreement with a policy balance that the legislature may well have struck.  Legislatures are entitled to design their own laws; and the North Carolina legislature might have concluded that the added expense to insurers is worth the increased likelihood of notice to in-state insureds.  That is a cost-benefit tradeoff for the legislature to make, and, unlike the majority, I decline Farm Bureau's invitation to make it myself.  If the faithful application of § 58-58-120 would truly result in a large, unnecessary burden on insurers, then they can pursue new legislation.  I have little doubt that the collective protestations of all the life insurance companies operating in North Carolina, decrying what

---

[1] Not that ex-North Carolinians will necessarily be left out in the cold.  Section 58-58-120 is a floor, not a ceiling.  Other states are welcome to pass their own laws protecting the rights of their residents to receive premium notices.  And insurers may need to provide pre-termination notice under the insurance contract.  But North Carolina may reasonably decide that those interests are best left to others and focus on protecting insured individuals living within its borders.

22

the majority and Farm Bureau insist is an enormous financial hardship, may just find a lawmaker's ear. And if § 58-58-120 does not represent the legislature's will, then the legislature can correct it.

Second, § 58-58-120 does not affirmatively require notices be sent to all insureds; it merely says that an insurer may not terminate a policy based on a defaulted payment unless it first either: (1) sends the necessary notice; or (2) waits one year after default. So an insurer need not send the notice every payment period, but only in those periods when a default is imminent. Farm Bureau correctly points out that the notice must be sent at least five days *before* the payment's due date, which means an insurer can't just wait to see whether a default happens and then send the notice after the due date has passed. But there are ways around this. For example, insurers could send the out-of-state insured a bill further in advance (perhaps with an incentive for prompt payment) and then send the § 58-58-120 notice only if they are not paid before the five-day mark. Or insurers might be able to wait until the original due date, and if no payment is received, voluntarily push back the due date by a few days and send the § 58-58-120 notice at least five days before this new due date.[2] Or, if all this is too much trouble, they could simply wait the year before ending coverage.

Finally, in general "[a] person may lawfully waive by agreement the benefit of a statutory provision." *Guilford Lumber Mfg. Co. v. Johnson*, 97 S.E. 732, 735 (N.C. 1919)

---

[2] This second option may give rise to some other legal issues, such as whether the "due date" provided for in § 58-58-120 is unmovably fixed by the contract or may be delayed by the insurer. I do not purport to pass judgment on this question, I merely note the option as a potential workaround.

23

(quoting 9 Mack William & Howard P. Nash, *Cyclopedia of Law and Procedure* at 480 (1901-1912)). It's thus plausible that an insured person could knowingly and affirmatively waive the protection of § 58-58-120 by filing with an insurer a change-of-address form reflecting that they no longer wish notices be sent to the prior address. Farm Bureau has not argued that Ms. Whitmire's submission of a change-of-address form to the Postal Service amounts to an affirmative waiver of § 58-58-120, so I need not decide whether § 58-58-120 can be waived. I merely note the possibility as one of several reasons why Farm Bureau's suggested catastrophe is far from certain.[3]

Farm Bureau did not send the notice prescribed by § 58-58-120, so it was precluded from cancelling Ms. Whitmire's insurance contract. Because that contract remained in force, and Farm Bureau having advanced no other contractual defenses, Mr. Whitmire is entitled to summary judgment in his favor on his breach-of-contract claims.

*       *       *

North Carolina is free to adopt whatever theory of statutory interpretation it chooses, including a theory that permits re-writing statutes based on some sense of equity or

---

[3] Consider also that, after enough time has elapsed, performance of the insurance contract may no longer be governed under North Carolina law and § 58-58-120 will no longer apply. *See Cont'l Cas. Co. v. Physicians Weight Loss Ctrs. of Am.*, 61 F. App'x 841, 844–45 (4th Cir. 2003) (per curiam) (noting the constitutional requirement of a "'close connection' between North Carolina and the interests insured by the policy" (quoting *Collins & Aikman Corp. v. Hartford Accident & Indem. Co.*, 436 S.E.2d 243, 246 (N.C. 1993))). Here, the district court held that North Carolina law applied only after observing that the premium payments had all been made from North Carolina, that Ms. Whitmire had lived there for most of the policy's existence, and that the servicing insurance agent was in North Carolina. *Whitmire*, 538 F. Supp. 3d at 600–01. Under a different factual scenario, a former resident may no longer be protected by § 58-58-120.

24

imagined purpose. The problem for the majority, however, is that it hasn't. In North Carolina the language of the statute has primacy. *See Lunsford*, 766 S.E.2d at 301. And here, the statutory language is unambiguously clear. The majority errs by ignoring that language to imagine some broad statutory purpose to justify its own re-write. In doing so, it ignores its own directive that we have a "solemn charge to interpret law created by others and not to prescribe what it shall be." Maj. Op. at 12 (citing *Danforth v. Minnesota*, 552 U.S. 264, 290 (2008)). North Carolinians should take heed of the Majority's free-flowing, strong purposivism, for tomorrow's decision might not be so mundane. I respectfully dissent.