**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 22-1793**

─────────────

ZION WILLIAMSON,

Plaintiff − Appellee,

v.

PRIME SPORTS MARKETING, LLC; GINA FORD,

Defendants – Appellants.

------------------------------

NATIONAL BASKETBALL PLAYERS ASSOCIATION,

Amicus Supporting Appellee.

─────────────

**No. 22-1946**

─────────────

ZION WILLIAMSON,

Plaintiff − Appellee,

v.

PRIME SPORTS MARKETING, LLC; GINA FORD,

Defendants – Appellants.

------------------------------

NATIONAL BASKETBALL PLAYERS ASSOCIATION,

Amicus Supporting Appellee.

---

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Loretta C. Biggs, District Judge.  (1:19−cv−00593−LCB−JLW)

---

Argued:  October 24, 2023                                    Decided:  May 6, 2024

---

Before DIAZ, Chief Judge, TRAXLER, Senior Circuit Judge, and Jamar K. WALKER, United States District Judge for the Eastern District of Virginia, sitting by designation.

---

Affirmed by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge Traxler and Judge Walker joined.

---

**ARGUED:**  Douglas Frederic Eaton, EATON & WOLK PL, Miami, Florida, for Appellants.  Zachary D. Tripp, WEIL, GOTSHAL & MANGES, LLP, Washington, D.C., for Appellee.  **ON BRIEF:**  Jeffrey S. Klein, CLARICK GUERON REISBAUM LLP, New York, New York; Lauren E. Richards, LOEB & LOEB LLP, New York, New York; John R. Wester, Fitz E. Barringer, ROBINSON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina; Robert B. Niles-Weed, Zachary A. Schreiber, WEIL, GOTSHAL & MANGES, LLP, New York, New York, for Appellee.  Ronald E. Klempner, NATIONAL BASKETBALL PLAYERS ASSOCIATION, New York, New York; Nicole A. Saharsky, Minh Nguyen-Dang, Erik P. Fredericksen, MAYER BROWN LLP, Washington, D.C., for Amicus Curiae.

---

2

DIAZ, Chief Judge:

In this case, we interpret the North Carolina Uniform Athlete Agents Act, which governs contracts between student-athletes and their agents. Prime Sports Marketing, LLC, and Gina Ford[1] argue that their former client, Zion Williamson, wasn't a "student-athlete" when he contracted with them, so he can't benefit from the Act's protections.

The district court rejected that argument. It also granted summary judgment to Williamson on Prime's contract and tort claims.

Because Williamson was engaged in an intercollegiate sport while on the Duke University men's basketball team, and was thus a "student-athlete," we agree with the district court that Prime's failure to comply with the Act's requirements voided the contract. We also affirm the district court's grant of summary judgment on Prime's contract and tort claims.

I.

A.

When he enrolled at Duke University, Zion Williamson was one of the most prominent young stars in basketball. As a freshman on the Duke men's basketball team, Williamson was named Atlantic Coast Conference (ACC) Player of the Year and led Duke to the ACC Championship. At the end of his first season, Williamson entered the NBA draft, where he was selected by the New Orleans Pelicans as the number one overall pick.

---

[1] We refer to Ford and Prime collectively as Prime.

3

Williamson's talents generated interest not just from basketball fans, but from agents eager to represent him. During his freshman year, Williamson began to communicate with Gina Ford, a marketing agent and Prime's president. Ford met with Williamson and his mother and stepfather several times to discuss Prime representing Williamson as his marketing agent when he turned pro.

After Williamson played his last game at Duke (but before being drafted), he hired Prime as his marketing agent. Under the agreement, the parties could terminate the contract only after five years, and then, only for cause.

For a few weeks, all seemed well. Ford secured a cover shoot and article about Williamson for Slam Magazine. She also sent Williamson two "Partnership Summaries," which contained a compilation of one-page offers purportedly made to Williamson by various companies, J.A. 1849–97, 1965, as well as a "Brand Management Strategy," which discussed Williamson's brand and identified "potential brand partnerships," J.A. 1426–45.

But the day after receiving the strategy document, Williamson's mother and stepfather told Ford that Williamson was terminating the Prime contract and instructed her to stop negotiating with third parties on Williamson's behalf. Unbeknownst to Ford, Williamson's parents also forwarded the strategy document and Partnership Summaries to agents from Creative Artists Agency ("CAA"), a competitor agency that Williamson had retained as his player agent.[2]

---

[2] A player agent helps an athlete negotiate his playing contract. A marketing agent (like Prime) helps an athlete develop his "brand" through endorsements and other marketing opportunities.

On May 31, 2019, Williamson emailed Ford to formally terminate the contract. That same day, Williamson signed a marketing contract with CAA. CAA later negotiated partnerships for Williamson with many of the same companies identified in Prime's partnership summaries.

B.

On June 2, 2019, Williamson's attorney sent a preemptive cease-and-desist letter to Prime. The letter stated that the Prime contract was void under the North Carolina Uniform Athlete Agents Act, N.C. Gen. Stat. § 78C-85 *et seq.*

Williamson alleged that the contract violated two provisions of the Act, which made it unenforceable. First, with two exceptions not relevant here, an agent seeking to contract with a student-athlete must register as an agent with the North Carolina Secretary of State. N.C. Gen. Stat. § 78C-88(a). If an agent fails to register, any agency contract the agent makes with a student-athlete is void. N.C. Gen. Stat. § 78C-88(d). Williamson claimed that because Ford never registered as an agent in North Carolina, the Prime contract was void.

Second, the contract must contain, "in close proximity to the signature of the student-athlete," a notice in boldface type and capital letters that states:

> **WARNING TO STUDENT-ATHLETE**
> **IF YOU SIGN THIS CONTRACT:**
> **(1) YOU SHALL LOSE YOUR ELIGIBILITY TO COMPETE AS A STUDENT-ATHLETE IN YOUR SPORT;**
> **(2) IF YOU HAVE AN ATHLETIC DIRECTOR, WITHIN 72 HOURS AFTER ENTERING INTO THIS CONTRACT, BOTH YOU AND YOUR ATHLETE AGENT MUST NOTIFY YOUR ATHLETIC DIRECTOR;**

5

**(3) YOU WAIVE YOUR ATTORNEY-CLIENT PRIVILEGE WITH RESPECT TO THIS CONTRACT AND CERTAIN INFORMATION RELATED TO IT; AND**
**(4) YOU MAY CANCEL THIS CONTRACT WITHIN 14 DAYS AFTER SIGNING IT.  CANCELLATION OF THIS CONTRACT SHALL NOT REINSTATE YOUR ELIGIBILITY.**

N.C. Gen. Stat. § 78C-94(c).

An agency contract lacking this exact warning is voidable by the student-athlete. N.C. Gen. Stat. § 78C-94(d).  The Prime contract didn't contain this notice, so Williamson stated that, even if the contract weren't void under the registration requirement, he was voiding the contract on this ground.

Prime responded that the Act didn't apply to the contract because Williamson wasn't a "student-athlete," as defined by the Act, when he signed it.  *See* N.C. Gen. Stat. § 78C-86(11).

Williamson then sued Prime in federal court, invoking the court's diversity jurisdiction.  He sought a declaratory judgment that Prime's violations of the Act voided the Prime contract.  He also claimed that Prime violated North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat § 75-1 *et seq.*, ("UDTPA") and that Prime fraudulently induced him to contract.

After the district court denied its motion to dismiss, Prime answered the complaint and counterclaimed.  As relevant here, Prime raised a breach of contract claim and two

6

related contract claims.  It also claimed that Williamson misappropriated its trade secrets and acquired its marketing materials by making fraudulent representations.[3]

Williamson moved for partial judgment on the pleadings on his declaratory judgment claim.  In response, Prime conceded that Ford never registered as an agent nor included the requisite warning in the Prime contract.  But it argued that Williamson wasn't a "student-athlete" under the Act because he allegedly violated National Collegiate Athletic Association (NCAA) rules, and those violations made him "permanently ineligible" to play college basketball.  *See* N.C. Gen. Stat. § 78C-86(11).

Under the Act, a player who is "permanently ineligible" to compete in intercollegiate sports isn't a "student-athlete" entitled to the Act's protections.  *Id.* Williamson disputed that he violated NCAA rules and argued that even if he did, those violations wouldn't impact whether he was a "student-athlete" under the Act.  Prime then moved to supplement its response with more evidence of Williamson's alleged wrongdoing.

The district court denied Prime's motion to supplement and granted Williamson's motion for partial judgment on the pleadings.  *Williamson v. Prime Sports Mktg., LLC*, No. 1:19-cv-593, 2021 WL 201255, at *9 (M.D.N.C. Jan. 20, 2021).  It held that Williamson was a student-athlete when he signed the Prime contract, and that Prime's allegations that Williamson violated NCAA regulations didn't create "a genuine issue of material fact as

---

[3] Prime raised eleven counterclaims in total, only some of which are relevant to this appeal.

7

to whether Plaintiff had been deemed permanently ineligible during the time period in question." *Id.* at *8. And it concluded that supplementing Prime's response with more evidence of Williamson's misconduct would be futile. *Id.* at *4.

After the district court entered judgment for Williamson, Prime filed four related motions seeking to amend, reconsider, or vacate the court's judgment. Prime also moved to amend its pleadings. The district court denied these motions. *Williamson v. Prime Sports Mktg., LLC*, No. 1:19-cv-593, 2021 WL 4193343, at *9 (M.D.N.C. Sept. 15, 2021).

Following discovery, the parties filed cross motions for summary judgment on Prime's counterclaims. The district court granted Williamson's motion and denied Prime's, holding that Prime's violations of the Act barred its contract claims. *Williamson v. Prime Sports Mktg., LLC*, No. 1:19-cv-593, 2022 WL 2802611, at *3–4, *12 (M.D.N.C. July 18, 2022). It also held that Williamson was entitled to summary judgment on Prime's fraud, misappropriation of trade secrets, and related claims because Prime failed to establish essential elements of those claims. *Id.* at *4–9. Williamson voluntarily dismissed his UDTPA and fraudulent inducement claims, and the court entered final judgment.

Prime now appeals (1) the grant of Williamson's motion for judgment on the pleadings; (2) the denial of its motion for leave to amend; and (3) the grant of summary judgment for Williamson on its counterclaims.

8

II.

A.

We begin with Prime's appeal of the district court's grant of judgment on the pleadings, which we review de novo. *Burbach Broad. Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 405–06 (4th Cir. 2002). We take all reasonable factual inferences in favor of Prime, as the non-moving party. *Id.*

Prime's appeal centers on one question: Who is a student-athlete subject to the Act? Because North Carolina law is silent on this question, we must anticipate how the Supreme Court of North Carolina would rule. *Stahle v. CTS Corp.*, 817 F.3d 96, 100 (4th Cir. 2016). And to do that, we must interpret the statute as North Carolina's high court would, using its tools of statutory construction. *Whitmire v. S. Farm Bureau Life Ins. Co.*, 52 F.4th 153, 158 (4th Cir. 2022).

"Under North Carolina law, 'the goal of statutory interpretation is to determine the meaning that the legislature intended upon the statute's enactment.'" *Id.* (quoting *State v. Rankin*, 821 S.E.2d 787, 792 (N.C. 2018)). We start by examining the plain language of the statute. *Rankin*, 821 S.E.2d at 792. "When the language of a statute is clear and without ambiguity," we must "give effect to the [statute's] plain meaning." *Diaz v. Div. of Soc. Servs.*, 628 S.E.2d 1, 3 (N.C. 2006) (cleaned up). And we must consider the text "within the context of the statute, rather than in isolation." *Farm Lab. Org. Comm. v. Stein*, 56 F.4th 339, 346 (4th Cir. 2022) (cleaned up).

Generally, once we determine the plain meaning of a statute's clear text, our inquiry ends. *Id.* But if the plain language is ambiguous, or seems to contravene legislative intent,

9

we may then examine "the legislative history, the spirit of the act[,] and what the act seeks to accomplish." *Rankin*, 821 S.E.2d at 792 (cleaned up).

1.

We first consider whether Williamson is a "student-athlete" based on the plain language of the Act. The Act defines "student-athlete" as:

> An individual who engages in, is eligible to engage in, or may be eligible to engage in any intercollegiate sport. If an individual is permanently ineligible to participate in a particular intercollegiate sport, the individual is not a student-athlete for the purposes of that sport.

N.C. Gen. Stat. § 78C-86(11).

In Prime's view, Williamson wasn't a "student-athlete" because he was "permanently ineligible," even though he was "engage[d] in" an intercollegiate sport. In other words, it reads the second sentence of the Act's definition as creating an exception to the first.

But according to Williamson, "the second sentence is not an exception at all." Appellee's Br. at 27. Instead, the second sentences *broadens* the statute to include athletes engaged in two sports, which he was not. Williamson reasons that if a student isn't engaged in (or eligible to engage in, or potentially eligible to engage in) a "*particular* intercollegiate sport," then he isn't a student-athlete for purposes of *that* sport, but will still be a student-athlete for other sports for which he's eligible. At the very least, Willamson argues, someone who is "permanently ineligible," by definition, doesn't "engage in"; isn't "eligible to engage in"; and won't ever be eligible to engage in an intercollegiate sport.

10

We agree with Williamson. If a student is engaged in an intercollegiate sport when he signs an agency contract, he is a student-athlete subject to the Act. The permanent ineligibility clause doesn't apply to Williamson, who was engaged in a single sport.

In our view, the legislature included the Act's second definitional sentence of "student-athlete" to protect two-sport athletes, and Prime's interpretation runs contrary to that purpose. While the second sentence might suggest that a student-athlete who violates NCAA rules can't benefit from the Act's protections, that construction works only if we ignore the first sentence. As was decidedly not the case with Williamson, an athlete who is "permanently ineligible" to compete is, by definition, *not* "engage[d] in, eligible to engage in, or potentially eligible to engage in an intercollegiate sport."

To the extent that the statutory language is ambiguous, a principle of statutory construction—the presumption against superfluity—lends support for our reading. When statutory language is ambiguous and one plausible reading would render another word, phrase, or section of the statute unnecessary, the presumption against superfluity tells us to adopt the interpretation that does not create any. *See State v. Coffey*, 444 S.E.2d 431, 417–18 (N.C. 1994) (stating that a statute should not be interpreted in a manner that would render any of its words superfluous).

Treating the Act's second sentence as an exception makes it unnecessary because the first sentence already encompasses athletes who are permanently ineligible. Put differently, if an individual is not engaging in, eligible to engage in, or potentially eligible to engage in an intercollegiate sport, then he is permanently ineligible. Prime's interpretation would strip the second sentence of its independent force.

11

We find additional support in the commentary to the Uniform Law Commission's model Athlete Agents Act, on which the North Carolina statute is based. The commentary explains: "The definition of 'student-athlete' applies to a two-sport athlete who has eligibility remaining in one sport. For example, an individual who has signed a contract to play professional basketball is not a student-athlete in basketball, but is a student-athlete in baseball." Unif. Athlete Agents Act § 2 & cmt.

The commentary closely tracks the language of the North Carolina statute, which specifies that if a person is ineligible for a "*particular* intercollegiate sport," he is not a student-athlete in "*that* sport." N.C. Gen. Stat. § 78C-86(11) (emphasis added). Had the legislature intended to adopt Prime's meaning, it could have written: "An individual who may be ineligible to play an intercollegiate sport is not a student-athlete." But it didn't. So long as a student-athlete is "engage[d] in" a particular intercollegiate sport (as Williamson was), he is a student-athlete under the Act for purposes of that sport.

2.

Next, Prime argues that a court may analyze the NCAA rules to determine that Williamson's rule violations made him permanently ineligible to compete, even while he was engaged an intercollegiate sport. We disagree.

Williamson and Prime both accept that "permanently ineligible" refers to ineligibility under the relevant NCAA regulations. The Act defines "intercollegiate sport" as a sport played at the collegiate level, whose "*eligibility requirements* for participation by a student-athlete *are established by a national association for the promotion or regulation of collegiate athletics*." N.C. Gen. Stat. § 78C-86(6) (emphasis added). So we

12

should look to the eligibility requirements that the relevant national association—here, the NCAA—has set out to determine whether a student-athlete is "permanently ineligible" to compete.

To participate in an intercollegiate sport, a student-athlete must comply with the NCAA's amateurism rules. *Bowen v. Adidas Am. Inc.*, 84 F.4th 166, 171 (4th Cir. 2023) (citing NCAA Bylaw § 12.01.1). Two of those rules are relevant here.

First, the rules forbid student-athletes and their families from accepting payments of any form in exchange for student-athletes' playing or agreeing to play a sport, with limited exceptions. NCAA Bylaw § 12.1.2(a). The rules also forbid a student-athlete from entering into an agreement with an unauthorized agent. NCAA Bylaw § 12.1.2(g).[4] If a student-athlete violates an amateurism rule, the NCAA or a member institution may declare him ineligible to play. *See* NCAA Bylaw § 12.1.2; *Bowen*, 84 F.4th at 171–72; *see generally Arlosoroff v. Nat'l Collegiate Athletic Ass'n*, 746 F.2d 1019, 1020 (4th Cir. 1984).

Prime alleges that Williamson violated both amateurism rules, which made him permanently ineligible to compete. But Prime ignores that the NCAA eligibility requirements are discretionary. *See United States v. Gatto*, 986 F.3d 104, 120–21 (2d Cir. 2021) (recognizing that the NCAA may choose to deem a student-athlete only temporarily ineligible).

---

[4] The rules authorize certain student-athletes to be represented by "NCAA-certified agent[s]," though no one claims this exception would apply to Williamson. *See* NCAA Bylaw § 12.3.1.2.

Here again, the model Act's commentary is informative. It explains that "violation of eligibility rules adopted by an educational institution or a national association is not automatic and does not occur until a determination has been made by the educational institution or national association." Unif. Athlete Agents Act § 10 & cmt. No such determination was made here. And without such a determination, a court can't hypothesize that the NCAA would have elected, in its discretion, to declare Williamson permanently ineligible because of his alleged rule violations.

In response, Prime points to the Act's warning language, that an athlete "shall" lose his ability to compete if he signs the contract. But that language serves only to trigger awareness and emphasize the gravity of the contract. Indeed, the model code and every other state that has enacted a similar statute require that the contract state only that an athlete "*may*" or will "likely" lose her ability to compete. [5] Prime's contrary reading runs

---

[5] *See* Unif. Athlete Agents Act § 10; *see generally* Ala. Code § 8-26B-10(c); Ariz. Rev. Stat. Ann. § 15-1770(C); Ark. Code Ann. § 17-16-110(c); Cal. Bus. & Prof. Code § 18897.73(a); Colo. Rev. Stat. § 23-16-209(c); Del. Code Ann, tit. 24, § 5409(c); D.C. Code § 47-2887.09(c); Fla. Stat. § 468.454(3); Ga. Code Ann. § 43-4A-15(c); Haw. Rev. Stat. § 481Z-10(c); Idaho Code Ann. § 54-4810(3); Ind. Code § 25-5.2-2-8(c); Iowa Code § 9A.110(3); Kan. Stat. Ann. § 44-1525(c); Ky. Rev. Stat. Ann. § 164.6917(3); La. Rev. Stat. Ann. § 4:423(B)(1)(b); Md. Code Ann., Bus. Reg § 4-409(c); Minn. Stat. § 81A.31(3); Miss. Code Ann. § 73-42-19(3); Mo. Rev. Stat. § 436.242(3); Neb. Rev. Stat. § 48-2610(3); Nev. Rev. Stat. § 398A.350(3); N.M. Stat. Ann. § 61-14F-10(C); N.Y. Gen. Bus. Law § 899-h(3); N.D. Cent. Code § 9-15.2-09(3); Ohio Rev. Code Ann. § 4771.02(A)(3); Okla. Stat. tit. 70, § 820.10(C); Or. Rev. Stat. § 702.047(3); 5 Pa. Cons. Stat. Ann. § 3510(c); R.I. Gen. Laws § 5-74.1-10(c); S.C. Code Ann. § 59-102-100(C); S.D. Codified Laws § 59-10-10(c); Tenn. Code Ann. § 49-7-2110(c); Tex. Occ. Code Ann. § 2051.204(a)(4); Utah Code Ann. § 58-87-301(3); Va. Code Ann. § 54.1-534(C); Wash. Rev. Code § 19.225.060(3); W. Va. Code § 30-39-10(c); Wis. Stat. § 440.994(3); Wyo. Stat. Ann. § 33-44-107(c).

14

headlong into the Act's uniformity clause, which instructs courts to give consideration "to the need to promote uniformity of the law with respect to its subject matter among states that enact it" when "applying and construing" the Act.  N.C. Gen. Stat. § 78C-102.

Prime next says that the fact that schools withdraw students from competition while they investigate NCAA rule violations is evidence that a student becomes ineligible the moment he violates the rules.  Otherwise, Prime says, a school would have no incentive to do so.  Not so.

For background, if the NCAA determines that a student violated NCAA rules but still competed, the NCAA may penalize the school.  *See, e.g.*, NCAA Bylaw 19.12.  So, to avoid that potential liability, a member school may (reasonably) choose to withdraw that student from competition during its investigation.  In that instance, the Act gives a school a right of action against a former student-athlete who violates the Act to recover damages caused by the school's "reasonable self-imposed disciplinary action taken to mitigate sanctions likely to be imposed by an athletic organization."  N.C. Gen. Stat. § 78C-100(a)– (b).

Prime says that this part of the Act requires a court to determine whether the school's self-imposed disciplinary action was "reasonable," which necessarily requires the court to review the applicable NCAA rules.  But that isn't relevant to whether the student-athlete was *permanently ineligible*, the question Prime asks us to resolve today.  Nor would it require a court to conclusively determine whether the student-athlete had, in fact, violated NCAA rules, just whether the school's response was "reasonable."

15

3.

Prime advances several additional arguments as to why Williamson was ineligible, none of which persuade. First, Prime analogizes to other cases that refuse to defer to the findings of certain governmental bodies. Appellants' Br. at 31–33 (collecting cases). But those cases are inapt. The Act explicitly contemplates that the NCAA is to set "eligibility requirements," N.C. Gen. Stat. § 78C-86(6), and thus be the final arbiter of a student-athlete's eligibility while he's in school.

And unlike the governmental bodies at issue in the cases Prime points to, the NCAA is a voluntary, private association. Under North Carolina law, "courts will not interfere with the internal affairs of voluntary associations." *McAdoo v. Univ. of N.C. at Chapel Hill*, 736 S.E.2d 811, 825 (N.C. Ct. App. 2013) (cleaned up). We don't know of any case in which a court has analyzed the NCAA bylaws to determine whether the NCAA hypothetically could have, under its own bylaws, elected to deem a student "permanently ineligible" to compete.

We also find Prime's reliance on *United States v. Gatto* misplaced. In *Gatto*, the defendants organized a scheme to make improper payments to basketball recruits, in violation of NCAA rules. 986 F.3d at 111. Prime highlights several statements in the district court's and Second Circuit's opinions, where the courts reference that the payments made the recruits "ineligible to compete." *See id.* at 112, 126; *United States v. Gatto*, 295 F. Supp. 3d 336, 339 (S.D.N.Y. 2018) ("Student-athletes who are recruited in violation of NCAA rules are ineligible to play.").

16

But neither court considered whether the athletes were "permanently ineligible" to compete under the Act. Indeed, the Second Circuit acknowledged that student-athletes may be deemed ineligible "temporarily," and may even be reinstated after serving suspensions. *See Gatto*, 986 F.3d at 120–21. That statement supports Williamson, not Prime.

Prime curiously points to two state court decisions enforcing penalties against agents who failed to register under other states' versions of the Act. Neither helps Prime.

In *Howard v. Mississippi Secretary of State*, an agent argued that Mississippi's version of the Act didn't apply to the student, since the student had purportedly exhausted his eligibility to play college basketball (and thus wasn't a "student-athlete"). 184 So.3d 295, 300 (Miss. Ct. App. 2015). But the court didn't consider this argument because the agent didn't make it during the state administrative proceedings. *Id.*

Likewise, in *Sloane v. Tennessee Department of State*, an unregistered agent argued that the student wasn't a "student-athlete" under Tennessee's version of the Act. No. M2019-00126-COA-R3-CV, 2019 WL 4891262, at *6 (Tenn. Ct. App. Oct. 3, 2019). Because the agent admitted that he violated the Act before the ALJ, the court rejected his defense as "completely without merit." *Id.*

According to Prime, both cases suggest that an agent may raise a student-athlete's "permanent ineligibility" as an affirmative defense. But because both courts found that the agent didn't raise this argument in prior proceedings, neither reached the question of whether the agent had sufficiently alleged that the student-athlete *was* "permanently ineligible" to compete.

17

We agree with the district court that neither case is relevant or persuasive, since neither answers the question Prime asks here: whether a district court may make an initial retroactive decision that the NCAA *would have*, in its discretion, declared a student-athlete permanently ineligible to compete, while he remained engaged in an intercollegiate sport.

Considering the statute's text and history, the answer is "no."[6]

B.

Now that we've determined that the Act applies to the Prime contract, we must decide whether the statute voids the contract. It does.

Prime concedes that Ford wasn't registered as an agent in North Carolina, and under the Act, any agency contract between a student-athlete and an agent who fails to register in North Carolina is automatically void. N.C. Gen. Stat. § 78C-88(d). Likewise, it's undisputed that the Prime contract didn't contain the requisite warnings. So even if the contract weren't already void, Williamson was free to void it, *see* N.C. Gen. Stat. § 78C-94(d), which he did both via email and through counsel.

Because the contract was void, the district court correctly granted Williamson's motion for judgment on the pleadings. And since we can't make a retroactive

---

[6] Our reading also comports with the Act's purpose. As amicus National Basketball Players Association explains, the Act was created to protect student-athletes and institutions from unscrupulous agents' misconduct. *See* Prefatory Note, Unif. Athlete Agents Act (2000) (citing agents' unethical practices when recruiting students-athletes and recognizing the "serious problems for student-athletes and educational institutions" such conduct poses); 15 U.S.C. § 7807 (stating that it is the "sense of Congress" that states should enact the Act "to protect student athletes and the integrity of amateur sports from unscrupulous sports agents"). And the Act applies to *all* student-athletes, even those who intend to leave intercollegiate sports after a single season, like Williamson. *See generally* N.C. Gen. Stat. § 78C-86(11) (defining "student-athlete").

18

determination about Williamson's permanent ineligibility to compete, we agree with the district court that any motion to amend Prime's complaint with other evidence of Williamson's rule violations would be futile. *See Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986) (explaining that while a district court should liberally allow a party to amend its pleadings, the court should deny the motion if "the amendment would be futile").

Finally, since the Prime contract was void, the district court properly granted summary judgment to Williamson on Prime's breach of contract and related contract claims. *See McDonald v. Bank of N.Y. Mellon Trust Co., Nat'l Ass'n*, 816 S.E.2d 861, 864–85 (N.C. Ct. App. 2018) (recognizing that the "existence of a valid contract" is necessary for breach of contract and good faith and fair dealing claims (cleaned up)).

## III.

Prime contends that even if the contract is void, it may still recover in tort for fraud and misappropriation of trade secrets. The district court granted summary judgment to Williamson on both claims, and we affirm.

### A.

We'll begin with Prime's fraud claim. To state a claim for fraud under North Carolina law, a plaintiff must show "(1) false representation or concealment of material fact, (2) reasonably calculated to deceive, (3) made with the intent to deceive, (4) which does in fact deceive, and (5) result[s] in damage to the injured party." *Harrold v. Dowd,* 561 S.E.2d 914, 918 (N.C. Ct. App. 2002) (citing *Ragsdale v. Kennedy*, 209 S.E.2d 494,

19

500 (N.C. 1974)).  A fraud claim may be based on an "affirmative misrepresentation of a material fact, or a failure to disclose a material fact relating to a transaction which the parties had a duty to disclose."  *Harton v. Harton,* 344 S.E.2d 117, 119 (N.C. Ct. App. 1986) (cleaned up).

Prime alleges that Williamson concealed facts that would have been material to its partnership with him, by not disclosing that he planned to send copies of Prime's marketing strategy to CAA.  The district court held that Prime didn't raise the false omission theory in its counterclaim, and that it couldn't "pivot" to a new legal theory at the summary judgment stage.  We disagree.

Prime's counterclaim alleges that Williamson had a "duty to speak" and "intentionally concealed the material fact" that he planned to provide Prime's marketing materials to CAA.  J.A. 154.  So, we may consider this theory on appeal.

But Prime's fraud claim is viable only if Williamson had a duty to speak.  *See Harton,* 344 S.E.2d at 119.  Specifically, Prime must show that (1) there was a fiduciary relationship between it and Williamson; (2) Williamson took affirmative steps to conceal material facts from Prime; or (3) Williamson "ha[d] knowledge of a latent defect in the subject matter of the negotiations about which [Prime was] both ignorant and unable to discover through reasonable diligence."  *Id.* (cleaned up).

Prime claims that Williamson's duty to disclose his outside negotiations to Prime arose from their fiduciary relationship.  As Prime argues, in North Carolina, the principal-agent relationship is a fiduciary one, and Williamson and Prime had a principal-agent relationship.  *See Honeycutt v. Farmers & Merchants Bank*, 487 S.E.2d 166, 168 (N.C. Ct.

20

App. 1997) ("An agent is a fiduciary with respect to matters within the scope of his agency."). The problem for Prime is that its failure to comply with the Act made any principal-agent relationship void, and thus didn't create a fiduciary duty.

Prime argues that even if no fiduciary duty existed between them, Williamson still had a duty to disclose because he took "affirmative steps to conceal material facts from the other." *See Godfrey v. Res-Care, Inc.*, 598 S.E.2d 396, 402 (N.C. Ct. App. 2004). Prime says that it's "undisputed" that Williamson took such steps to conceal his intent to terminate Prime and provide its marketing plan to CAA, but it doesn't elaborate further. Appellants' Br. at 54.

We aren't persuaded. Though parties negotiating at arm's length may have a duty to disclose some things, a party has no duty to disclose that he's negotiating with a third party in a commercial transaction. *See Comput. Decisions, Inc. v. Rouse Off. Mgmt. of N.C., Inc.*, 477 S.E.2d 262, 266 (N.C. Ct. App. 1996). And we decline to enforce any duty to disclose, even in an arm's length negotiation, when the underlying relationship between the parties is illegal.

We thus affirm the district court's grant of summary judgment on Prime's fraud claim.

B.

We come now to Prime's final claim, that Williamson misappropriated its trade secrets. The district court held that Prime's marketing materials weren't trade secrets. We agree.

21

North Carolina law defines a trade secret as:

[B]usiness or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:

(a) derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

(b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3).   A plaintiff must specify a trade secret with sufficient particularity; simply making "general allegations in sweeping and conclusory statements" won't do. *Washburn v. Yadkin Valley Bank & Tr. Co.*, 660 S.E.2d 577, 585 (N.C. Ct. App. 2008).

Prime claims that its "marketing materials," including "a compilation of endorsement offers that [Ford] obtained from various brands" were trade secrets. Appellants' Br. at 56.  But a trade secret must be more than "a nebulous, potential business opportunity, not yet realized, that is being offered by a third-party individual." *RLM Commc'ns v. Tuschen*, 66 F. Supp. 3d 681, 700 (E.D.N.C. 2014), *aff'd*, 831 F.3d 190 (4th Cir. 2016).

We think that Prime's "compilation of endorsement offers," is too nebulous to qualify for trade secret protection.  Most of the endorsement offers contain minimal information, and many lack concrete offer amounts.  A few of the endorsement offers do contain offer amounts, commitments, and other contract terms that Prime purportedly

22

negotiated. But looking at the compilation of offers collectively, as Prime does, we can't say that it represents anything more than unrealized invitations to negotiate.

And even if the offers were concrete, Prime's misappropriation claim fails because the offers were "readily ascertainable through independent development." N.C. Gen. Stat. § 66-152(3). It didn't matter that Williamson had forwarded the partnership summaries to CAA, since the companies described in the summaries independently initiated deals with CAA.

The district court correctly dismissed Prime's misappropriation of trade secrets claim.

* * *

For these reasons, we affirm the district court's judgment.

*AFFIRMED*