**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

**No. 24-2173**

———————————

SAMUEL SHERBROOKE CORPORATE, LTD; SAMUEL GOLDNER,

Plaintiffs - Appellants,

v.

GABRIEL MAYER; BEAU WALKER; JOSEPH MATTHEW QUEEN; HELIOS
RISK SOLUTIONS, LLC,

Defendants - Appellees.

———————————

Appeal from the United States District Court for the Eastern District of North Carolina, at
Raleigh.  Terrence W. Boyle, District Judge.  (5:24-cv-00057-BO-RJ)

———————————

Argued:  October 22, 2025                    Decided:  November 18, 2025

———————————

Before AGEE, THACKER, and RICHARDSON, Circuit Judges.

———————————

Reversed and remanded by published.  Judge Thacker wrote the opinion, in which Judge
Agee and Judge Richardson joined.

———————————

**ARGUED:**  Dylan Michael Bensinger, MCGUIREWOODS, LLP, Charlotte, North
Carolina, for Appellants.  David L. Pardue, PIERSON FERDINAND, Atlanta, Georgia,
for Appellees.  **ON BRIEF:**  Jonathan Y. Ellis, Raleigh, North Carolina, Brian A. Kahn,
Zachary L. McCamey, Elizabeth P. Briand, MCGUIREWOODS LLP, Charlotte, North
Carolina, for Appellants.  Brian D. Stoltz, Atlanta, Georgia, Scott E. Bayzle, Andrew P.
Tabeling, PARKER POE ADAMS & BERNSTEIN LLP, Raleigh, North Carolina, for
Appellees.

---

THACKER, Circuit Judge:

The question in this appeal is whether Samuel Sherbrooke Corporation ("Sherbrooke") and Samuel Goldner ("Goldner," and with Sherbrooke, "Appellants") sufficiently pled their Defend Trade Secrets Act ("DTSA") claim against Gabriel Mayer, Beau Walker, and Joe Queen (collectively, "Appellees").

We conclude that they did because the Complaint plausibly alleges that Sherbrooke owned a trade secret that it took reasonable measures to secure and that Appellees misappropriated that trade secret.

Therefore, we reverse the district court's decision dismissing their Complaint.

I.

On June 5, 2018, Sherbrooke was incorporated as a captive insurance company in North Carolina. As a captive insurance company, Sherbrooke insures only its "captive," which are nursing homes and other entities owned by Goldner's company, Goldner Capital Management. Sherbrooke has only three shareholders -- Goldner, who is the majority shareholder, and Mayer and Queen, who are each minority shareholders. These three shareholders elected themselves as Sherbrooke's directors. Goldner stepped away from day to day operations of Sherbrooke, so Mayer and Queen "assumed and performed all operations of Sherbrooke as the primary officers." J.A. 13.[1]  "[A]s directors, officers, and minority shareholders, . . . Mayer and . . . Queen had complete, total, and formidable managerial control over Sherbrooke since its formation and incorporation." *Id.*

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Goldner hired Walker as Sherbrooke's Chief Technology Officer in March 2022. According to the Complaint, Walker's "responsibilities included designing, creating, and maintaining proprietary software (the 'Proprietary Software') for the exclusive use of Sherbrooke and its related entities." J.A. 17. "The Proprietary Software enabled Sherbrooke to, among other things, incorporate and utilize medical records to project and predict risk values in pricing individual covered incidents more effectively." *Id.* at 18. "In addition, the Proprietary Software is used by Sherbrooke to more accurately price insurance contracts for both existing and potential customers to provide competitive and profitable insurance policies for Sherbrooke and its customers." *Id.* And, the Proprietary Software "provides additional services to Sherbrooke, which produce enormous economic value due to its secrecy and proprietary nature." *Id.*

Relevant here, the Complaint alleges that each of the Appellees was required to sign an employment contract. The employment contracts contained the following confidentiality agreement:

> [The employee] shall not, at any time hereafter, disclose Confidential Information to any Person or use or exploit Confidential Information for any purpose other than for the benefit of the [Sherbrooke] thereof in the regular course of his engagement and within the scope of his authority and responsibility (a) without the prior written authorization or consent of [Sherbrooke], (b) unless such Confidential Information is already known by Employee prior to the time such Confidential Information is acquired by Employee in the course of his engagement,(c) unless such Confidential Information is already known by the Person to whom disclosure is made prior to the time of disclosure by Employee, or (d) if, and to the extent, disclosure is required by applicable law, subpoena or other compulsory legal process, or an order of a court or governmental agency, commission or other

4

> authority; provided that, in such case, if permitted by law, such legal process or order, Employee shall promptly notify [Sherbrooke] of such required disclosure so that [Sherbrooke] may oppose such disclosure or seek a protective order or other confidential treatment of such Confidential Information.

J.A. 13 (first alteration supplied, remaining alterations in original).

Each employment contract also included an "Inventions Provision," which stated,

> any invention, idea, design, process, system, procedure, improvement, development or discovery (an "Invention") conceived, created, made or developed by Employee, alone or with others, (a) during the Term or (b) during the balance of the Restricted Period, if such Invention incorporates, is derived from, or is based upon any Confidential Information, and, in either case, that is applicable to the business of [Sherbrooke], whether or not patentable or registrable, shall become the sole and exclusive property of [Sherbrooke].

J.A. 14–15 (alterations in original).

The Complaint alleges that "[a]ny property that [Appellee] Walker created during or related to his employment as CTO of Sherbrooke, including but not limited to the Proprietary Software, is the confidential and exclusive property of Sherbrooke." J.A. 18. It further alleges, "[t]his Proprietary Software is—and always has been—the confidential property of Sherbrooke. Sherbrooke has used all commercially reasonable measures to ensure that the Proprietary Software remains confidential and provides unique value to Sherbrooke." *Id.*

Appellants claim that Appellees violated their employment contracts and misappropriated the Propriety Software. According to the Complaint, "in or around 2022, [Appellee] Queen and [Appellee] Mayer began preparations to create a corporate entity to compete with Sherbrooke and its corporate affiliates. At some time thereafter, [Appellee]

5

Walker joined this scheme." J.A. 18. "Upon information and belief, [Appellee] Walker—in coordination with [Appellee] Queen and [Appellee] Mayer—is actively using confidential property of Sherbrooke, including but not limited to the Proprietary Software to assist with operating this new competing insurance entity." *Id.* at 19.

Goldner learned about Appellees' "coordinated effort to undermine Sherbrooke and its related corporate entities," in December 2023, and immediately took steps to terminate Appellees' employment and also to remove Mayer and Queen as directors of Sherbrooke. J.A. 20. But, the Complaint alleges that Mayer and Queen "refused to relinquish control over Sherbrooke and its assets, including liquid, tangible, intangible, and other assets." *Id.* at 21.

On January 30, 2024, Appellants sued Appellees in the Eastern District of North Carolina, alleging, in addition to various state law claims related to corporate malfeasance, that Appellees misappropriated Sherbrooke's trade secrets in violation of the DTSA. Appellees later moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). After a hearing, the district court entered a written order granting Appellees' motion for judgment on the pleadings as to the DTSA claim and declining to exercise supplemental jurisdiction over all of the remaining state law claims.[2]

Appellants timely filed this appeal.

---

[2] Appellants do not challenge the district court's order dismissing the state law claims.

II.

We review the district court's grant of judgment on the pleadings de novo. *See Williamson v. Prime Sports Marketing, LLC*, 101 F.4th 302, 309 (4th Cir. 2024). In doing so, we apply the same standard applicable to motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Conner v. Cleveland Co.*, 22 F.4th 412, 416 (4th Cir. 2022). That is, we accept the well pled facts "as true and draw[] all reasonable inferences in [Appellants'] favor." *Id.* (citation omitted). "[T]hose allegations must be sufficient to support 'a claim to relief that is plausible on its face.'" *Sysco Machinery Corp. v. DCS USA Corp.*, 143 F.4th 222, 228 (4th Cir. 2025) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A plausible claim to relief demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Id.* (cleaned up). "When it is a claim for trade secret misappropriation under the DTSA . . . it demands plausible allegations both that the plaintiff possessed a valid trade secret and that the trade secret was misappropriated." *Id.* (cleaned up).

III.

To state a viable DTSA claim, a plaintiff must plausibly allege that (1) it owns a trade secret; (2) the trade secret was misappropriated; and (3) the trade secret implicates interstate or foreign commerce. *See Sysco Machinery Corp. v. DCS USA Corp.*, 143 F.4th 222, 228–29 (4th Cir. 2025).

A.

Pursuant to the DTSA, information is a trade secret if (1) its owner "has taken reasonable measures to keep [it] secret" and (2) it "derives independent economic value"

7

from its secrecy. 18 U.S.C. § 1839(3). The district court determined that Appellants failed to plausibly allege they took reasonable measures to protect the secrecy of the Proprietary Software. On appeal, Appellants argue they did sufficiently plead the secrecy element because they pled that Appellees were required to sign the employment contract which included the confidentiality agreement and Invention Provision. And they argue that they sufficiently connected those provisions to the Proprietary Software. We agree.

The Complaint makes clear that the "Proprietary Software is—and always has been—the confidential property of Sherbrooke." J.A. 18. It also alleges that the employment contract specified that employees "shall not, at any time hereafter, disclose Confidential Information." *Id.* at 13. And it alleges that the Invention Provision provided, "any invention, idea, design, process, system, procedure, improvement, development or discovery (an 'Invention') conceived, created, made or developed by Employee" through their employment "shall become the sole and exclusive property of [Sherbrooke]." *Id.* at 14–15. Taking these allegations as true, we have no trouble concluding that the Complaint sufficiently alleges that the Proprietary Software, which was "confidential property," was treated as confidential information under the employment contract.

Appellees argue that the Complaint fails to make this connection because the facts pled do not allow us to "know[] whether, for example, the 'Proprietary Software' uses open source code which is already publicly available (and, thus, could not be confidential as a matter of law) . . . . As such, it is impossible to know if the alleged confidentiality provision would apply (or whether it would even be enforceable)." Response Br. at 11. But this argument requires too much. Appellants did not need to *prove* anything. They only needed

8

to plausibly allege that the Proprietary Software was covered by the confidentiality provision, which was a reasonable measure intended to keep it secret. Appellants did so here.

Even still, Appellees argue that the existence of a confidentiality provision alone is not sufficient as a matter of law to demonstrate reasonable efforts to maintain secrecy. At this stage of the proceedings, we disagree, and the Ninth Circuit has concluded similarly. In *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, the Ninth Circuit held, "[c]onfidentiality provisions constitute reasonable steps to maintain secrecy." 978 F.3d 653, 660 (9th Cir. 2020). True, plaintiffs often allege that they did more than simply require a signed confidentiality agreement to maintain secrecy. *See e.g.*, *dmarcian, Inc. v. dmarcian Europe BV*, 60 F.4th 119, 142 (4th Cir. 2023) (finding a likelihood of success on the merits in the context of a preliminary injunction and noting that the plaintiff had "taken steps to keep such information secret through security measures restricting access to the source code *and* requiring confidentiality agreements from employees" (emphasis supplied)); *Ahern Rentals, Inc. v. EquipmentShare.com, Inc.*, 59 F.4th 948, 956 (8th Cir. 2023) (finding that plaintiff sufficiently plead reasonable steps where it alleged it "requires its employees to sign detailed non-disclosure, non-solicitation, and non-competition agreements," and alleged that "its employees must comply with strict social media, internet, and email policies that prohibit employees from disclosing or otherwise publishing trade secrets" (cleaned up)); *Allstate Ins. Co. v. Fougere*, 79 F.4th 172, 192–93 (1st Cir. 2023) (finding Plaintiff took "multiple steps towards protecting the information" where it required a signed exclusive agency agreement that identified which information was confidential,

9

granted access only to certain agents, used password protection, and revoked access upon employment termination). But that does not mean they are required to allege more, and we see no reason to create such a requirement.

Trade secrets take many forms and what may constitute "reasonable measures" must be considered in light of the nature of the trade secret and the context in which it exists. *See In the Matter of Innovative Const. Sys., Inc.*, 793 F.2d 875, 884–85 (7th Cir. 1986) ("In asking whether particular efforts were reasonably adequate under the circumstances, the jury is called upon in part to exercise their common-sense judgment in determining whether additional measures were necessary to guard the secrecy of the formulas. . . . What may be reasonable measures in one context may not necessarily be so in another."). At the pleading stage, then, it is sufficient that Appellants allege they protected the Proprietary Software by requiring employees to sign the confidentiality agreement and Invention Provision contained in the employment contract.[3]

## B.

Having concluded that Appellants plausibly allege the existence of a trade secret, we next consider whether they plausibly allege that Appellees misappropriated it. Relevant here, the DTSA defines misappropriation as the "disclosure or use of a trade secret of another" without consent by a person who, at the time of the use, "knew or had reason to

---

[3] Appellees argue that the Complaint fails to allege that *every* person who had access to the Proprietary Software was required to sign the employment contract. We reject that argument because we can reasonably infer from the Complaint that the employment contract applied to all employees.

know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret." 18 U.S.C. § 1839(5).

The only question before us is whether the Complaint plausibly alleges that Appellee's disclosed or used the trade secret. Appellees argue it does not because, in their view, the Complaint only includes a single conclusory allegation that they "[are] actively using" the Proprietary Software to operate their new competing insurance company. J.A. 19. Not so.

As explained above, the Complaint alleges that Walker was hired as Sherbrooke's Chief Technology Officer for the purpose of "designing, creating, and maintaining" the Proprietary Software. J.A. 17. The Complaint further alleges that "[t]he Proprietary Software enabled Sherbrooke to, among other things, incorporate and utilize medical records to project and predict risk values in pricing individual covered incidents more effectively." *Id.* at 18. And it alleges that the Proprietary Software "is used by Sherbrooke to more accurately price insurance contracts for both existing and potential customers to provide competitive and profitable insurance policies for Sherbrooke and its customers." *Id.* Additionally, the Complaint includes the following allegations:

> 49. Upon information and belief, in or around 2022, Defendant Queen and Defendant Mayer began preparations to create a corporate entity to compete with Sherbrooke and its corporate affiliates. At some time thereafter, Defendant Walker joined this scheme.
>
> 50. The purpose of this competing corporate entity is to provide insurance policies to, among other companies, nursing facilities across the United States. Therefore, Director and Officer Defendants intend to directly compete for the same

11

> companies or entities that Sherbrooke has always used as clients.
>
> 55. Upon information and belief, Defendant Walker—in coordination with Defendant Queen and Defendant Mayer—is actively using confidential property of Sherbrooke, including but not limited to the Proprietary Software to assist with operating this new competing insurance entity.

*Id.* at 18–19.

Each of these allegations is relevant to Appellants' misappropriation claim, and together they tell the story of the alleged misappropriation. Much more than a bare allegation of "use," the Complaint explains that Walker created the Proprietary Software and Queen and Mayer were shareholders, directors, and officers of Sherbrooke, such that they knew about the Proprietary Software. The Complaint alleges that all three Appellees created a competing business and used the Proprietary Software to assist that competing business, rather than Sherbrooke. In the context of this alleged Propriety Software, we find these allegations sufficient to state a claim for misappropriation. After all, what does one do with a stolen competitive pricing software except "use" it, as alleged in this case, "to assist with operating this new competing insurance entity"? J.A. 19.

## IV.

At the pleading stage of the proceedings, Appellants are required to do no more than plead facts sufficient to plausibly allege that Appellees misappropriated their trade secret. Because we readily conclude that Appellants have done so, we reverse the district court's order dismissing the DTSA claim and remand for further proceedings.

*REVERSED AND REMANDED*